IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-10995
Summary Calendar

_____


AMY E. BELMAGGIO,

                              Plaintiff-Appellant,

                    versus

JOHN DALTON, Secretary of the Navy;
DANIEL T. OLIVER, Vice Admiral, Chief
of Naval Personnel; D. A. LEWELLING,
Captain, Commanding Officer, Naval Air
Station/Joint Reserve Base; SUSAN RAMSKILL,
Lieutenant Commander, Officer in Charge
of Personnel Support Detachment,

                              Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Texas
(4:96-CV-919-A)
_____

September 16, 1998

Before REAVLEY, KING and DAVIS, Circuit Judges.

REAVLEY, Circuit Judge:[*]

    Former Air Traffic Controllman Second Class Amy E. Belmaggio

sued the Navy Secretary and three naval officers in their

official capacities, alleging that the Navy violated her

constitutional and regulatory rights when it administratively

_____

    [*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

separated her from the Navy for cocaine use and that the Board for Correction of Naval Records (BCNR) decision denying her relief was arbitrary and capricious. The district court granted summary judgment in favor of the defendants. For the reasons discussed below, we affirm.

**BACKGROUND**

On April 30, 1996, Belmaggio underwent a urinalysis test which later tested positive for cocaine. She was charged with violation of the Uniform Code of Military Justice (UCMJ), Article 112(a), for use of a controlled substance. Belmaggio refused non-judicial punishment under 10 U.S.C. § 815 and demanded a trial by court-martial. Charges were referred to a Special Court-Martial on July 16, 1996, and Belmaggio was arraigned pursuant to 10 U.S.C. § 839(a) on August 20. On August 25, Belmaggio's counsel served a notice of intent to file a motion to suppress the urinalysis evidence on the military judge and trial counsel. On August 28, the convening authority dismissed the charges "without prejudice." The matter was referred to an administrative discharge hearing on August 29, 1996, to be heard by an Administrative Discharge Board (ADB).

The administrative board found that misconduct had occurred and recommended that Belmaggio be discharged with an other than honorable discharge. Belmaggio filed a letter of deficiency and requested a review by the Bureau of Naval Personnel and a *de novo*

2

review by a flag officer.  The Bureau of Personnel, without granting the flag officer review, sustained the recommendations of the board.

Belmaggio then filed this action in district court to prevent her discharge from the U.S. Naval Reserve.  The district court temporarily enjoined the defendants from discharging Belmaggio until the Board of Correction of Naval Records (BCNR) heard her case.  The BCNR refused Belmaggio's request for relief.  After further proceedings, the district court entered summary judgment in favor of the defendants.

**DISCUSSION**

1.  *Standard of review*

This court reviews a grant of summary judgment by the district court *de novo*.[1]  In reviewing the decision of a military correction board, the court will uphold them unless they are arbitrary, capricious, in bad faith, unsupported by substantial evidence or contrary to a law, regulation or mandatory published procedure of a substantial nature to prejudice the plaintiff.[2]

2.  *The timing of the summary judgment*

---

[1]*Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997).

[2]*Ferrell v. Secretary of Defense*, 662 F.2d 1179, 1181 (5th Cir. 1981).

Belmaggio argues that the district court erred by granting summary judgment before she filed her renewed cross-motion for summary judgment and memorandum in opposition to the defendants' renewed motion to dismiss and for summary judgment.

On April 28, the district court ordered defendants to file a motion to dismiss, which they did on May 27, 1997. Belmaggio filed a cross-motion for summary judgment on June 9. On June 23, the district court entered a final judgment dismissing the action. The district court *sua sponte* vacated this judgment on June 26. The defendants filed their response to Belmaggio's cross-motion for summary judgment on June 30. On July 10, the court ordered Belmaggio to file an amended complaint and directed both sides to brief the confrontation clause issues. Belmaggio filed an amended complaint on July 22. Both parties then filed briefs on the confrontation clause issue. On August 7, the defendants filed their renewed motion to dismiss or in the alternative for summary judgment. The district court denied the motion to dismiss and granted the motion for summary judgment on August 10. The final judgment was filed August 12, two days before the court received and filed Belmaggio's renewed cross-motion for summary judgment.

Under Federal Rule of Civil Procedure 56(c), "[t]he motion [for summary judgment] shall be served at least 10 days before the time fixed for the hearing."

> As a general rule, a district court may not
> sua sponte grant summary judgment on a claim
> without giving the losing party ten days'
> notice and an opportunity to present new

4

> evidence as required by Federal Rules of
> Civil Procedure 56(c). There is an exception
> to this rule, however: A district court may
> grant summary judgment without notice if the
> losing party has had a "full and fair
> opportunity to ventilate the issues involved
> in the motion."[3]

This court has held that the ten day notice provision of 56© is to be strictly enforced.[4] If the nonmovant does not make a showing of evidence that creates a genuine issue of material fact, however, lack of notice is deemed harmless error.[5]

In this case, any error was harmless. The defendants' renewed motion raised effectively the same arguments as the motion filed approximately nine weeks earlier. The issues in dispute remained constant at the lower court level, before and after Belmaggio submitted her amended complaint. Thus, even though Belmaggio was not granted ten days to respond to the renewed motion for summary judgment, she had a fair opportunity to respond to the arguments. Belmaggio has not articulated any specifics as to what evidence or argument she might have raised that would have prevented summary judgment if she had been granted additional time.[6]

---

[3]*United States v. Grayson*, 879 F.2d 620, 625 (9th Cir. 1989) (citations omitted).

[4]*Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 504 (5th Cir. 1994).

[5]*Id.* at 505.

[6]Reviewing the record, Belmaggio's renewed motion opposing defendants' renewed motion for summary judgment was almost identical to her first motion. The few differences do not create an issue that would prevent a grant of summary judgment. For

3.   *Removal of case from court-martial proceedings*

Belmaggio's commanding officer at the time of the urinalysis, Captain Cannon, originally decided to dispose of the issue through nonjudicial punishment.  Pursuant to Article 15, Belmaggio refused nonjudicial punishment and demanded trial by court-martial, and  Captain Cannon referred a charge of drug use to a court-martial.  Shortly thereafter, Captain Lewelling relieved Captain Cannon as Belmaggio's commanding officer.  Captain Lewelling dismissed the charge from the court-martial and initiated administrative separation proceedings against Belmaggio.  At the ADB hearing, Captain Lewelling stated that the charge did not warrant trial by court-martial and the matter should be disposed of administratively.

Belmaggio argues that the Navy improperly withdrew the charges for court-martial and sent the charges to the administrative board.  Article 15.2 of the Manual for Courts-Martial states that a member of the forces may demand trial by court-martial in lieu of nonjudicial punishment, prior to the imposition of nonjudicial punishment.  However, the commanding officer could still choose to send the charges to an administrative discharge board.  "Nonjudicial punishment" refers

---

example, in her second motion, Belmaggio includes an argument based on *Petty v. Moriarty*, 43 C.M.R. 278 (U.S.C.M.A. 1971). *Petty* is irrelevant, because it addressed the issue of whether charges could be withdrawn and then sent to a second court-martial, not an administrative board as is the case here.

to punishment imposed by a commanding officer in lieu of a court-martial; it is not the equivalent of administrative proceedings.[7]

The Commanding Officer has the discretion to change his mind about continuing the court-martial.[8]  Belmaggio contends that, once referred for a court-martial, certain rights vest, including the right to be proven guilty beyond a reasonable doubt, and the right to confront witnesses.  Belmaggio argues that the Commanding Officer can withdraw charges from a court-martial only if the withdrawal is not arbitrary or unfairly prejudicial to the rights of the accused.[9]  Under the Rules of Court Martial, R.C.M. 604:

> (a) *Withdrawal*.  The convening authority or a superior authority may for any  reason cause any charges or specifications to be withdrawn from a court-martial  at any time before findings are announced.
> (b) *Referral of withdrawn charges*.  Charges which have been withdrawn from a  court-martial may be referred to another court-martial unless the withdrawal  was for an improper reason.  Charges withdrawn after the introduction of evidence on the general issue of guilt may be referred *to another court-martial* only if the withdrawal was necessitated by urgent and unforeseen military  necessity. (Emphasis added)

---

[7]*See* Exec. Order No. 12473, 49 Fed. Reg. 17152, Part V: Nonjudicial Punishment Procedure § 1.g: Relationship of nonjudicial punishment to administrative corrective measures (1984); *Dobzynski v. Green*, 16 M.J. 84, 88 (C.M.A. 1983) (Everett, C.J., dissenting) (noting that the record of nonjudicial punishment can be used "in connection with an administrative discharge," indicating that the two are different).

[8]R.C.M. 604.

[9]*United States v. Charette*, 15 M.J. 197 (C.M.A. 1983).

Belmaggio argues that "[t]he purpose of R.C.M. 604(b) ... is to check potential unfair manipulation of the charging and dismissal processes to gain unfair advantage over an accused, to prevent prosecutorial harassment, and to prevent retaliation against the accused for exercising a right."[10]  *Koke* sets out various factors to consider, including the stage of the court-martial proceedings.[11]  However, rule 604(b) and these cases do not apply in this case, as the charges were referred to an administrative board, not another court-martial, as was the situation in *Koke*.[12]

Belmaggio argues that the actions of the convening authority exposed her to a greater risk of prejudicial discharge.  The administrative board proceedings did allow for a lower standard of proof and less stringent rules for the introduction of evidence.  However, under an administrative proceeding, Belmaggio

---

[10]*United States v. Koke*, 32 M.J. 876, 879 (N.M.C.R. 1991), *aff'd* 34 M.J. 313 (1992).

[11]*Id.* at 880-81.

[12]In a similar vein, Belmaggio directs this court to the dissenting opinion in *Dobzynski v. Green*, 16 M.J. 84 (C.M.A. 1983), to support her contention that because she had the right to refuse nonjudicial punishment and demand trial by court-martial, she had an absolute right to a court-martial.  In *Dobzynski*, the dissent noted that if a member who was *not* attached to a vessel was taken to a special court-martial, then the charges were withdrawn and the member was offered nonjudicial punishment, the member could refuse nonjudicial punishment under 604(b); the commanding officer would have to refer the charges to another court-martial or dismiss the charges. *Dobzynski*, 16 M.J. at 86-87.  However, even in the dissent's hypothetical, the commanding officer would have the power to refer to another court-martial (within certain limits) or for *administrative* proceedings.

was no longer subject to imprisonment, a bad conduct discharge, forfeiture of pay and allowances, or a reduction in pay grade.

Belmaggio argues that once the convening authority decides to refer the case to court-martial, "the election of remedies shifts to the servicemember."[13]  She takes this quote out of context.  The court went on to discuss the service member's options to contest the charges, plead guilty or try to negotiate a deal.  There is no indication that the right to a court-martial somehow "vests," as Belmaggio contends.

The MCM provides commanding officers with broad discretion when determining how to dispose of offenses committed by members of their command.[14]  "When a commander dismisses charges further disposition under R.C.M. 306© of the offenses is not barred."[15]  The BCNR did not err in finding that Captain Lewelling acted within his authority.

4.  *Review of the BCNR's findings*

Belmaggio argues that the court erred in adopting the BCNR's findings because they were arbitrary and capricious.

Belmaggio first argues that the BCNR erred by not allowing her to appear before the board.  Belmaggio had previously received a full hearing before the ADB.  Under 32 C.F.R. §723.4,

---

[13]*United States v. Gansemer*, 38 M.J. 340, 342 (C.M.A. 1993).

[14]*See* R.C.M. 306(c).

[15]Exec. Order 12473, 49 Fed. Reg. 17152 (1984).

9

an "applicant for correction" of his/her record is entitled to appear. Belmaggio argues that she would have demonstrated several things had she been allowed to appear. However, that provision only applies if the "Board determines a hearing is warranted," which it did not do in this case.[16] The BCNR is not required to hold a hearing.[17] The BCNR conducted a documentary review of Belmaggio's application, including her thirty-page application for relief and the transcript of the ADB hearing. Under the circumstances, Belmaggio has not shown that their decision to deny her a personal appearance was arbitrary or capricious.

Belmaggio also contends that the BCNR erred by not requesting an advisory opinion from the authors of the regulations governing the procedures for urinalysis tests to ascertain whether the local procedure complied with required safeguards or met the intent of the instruction. Belmaggio argues that the BCNR has a duty to correct "obvious injustices" by the military, and that the Secretary has a duty to take corrective action for any error or injustice.[18] Although correct, those statements do not determine the substantive issues. Neither the statute empowering the BCNR to correct errors nor its regulations require that it obtain an advisory

---

[16]32 C.F.R. § 723.4(a) (1997).

[17]*Burns v. Marsh*, 820 F.2d 1108, 1109 (9th Cir. 1987).

[18]*Duhon v. United States*, 461 F.2d 1278, 1281 (Ct. Cl. 1972); *Caddington v. United States*, 178 F. Supp. 604 (Ct. Cl. 1959).

10

opinion prior to deciding the case.[19]  The BCNR reviewed both the administrative record and the regulations before concluding that the procedures used in obtaining Belmaggio's urine sample and transport to the laboratory complied.  Nothing further was required.

Lastly, Belmaggio argues that the BCNR's decision was unsupported by substantial evidence.  Belmaggio spent the three days preceding the urinalysis with a retired Chief Petty Officer, who testified that she did not observe Belmaggio ingest cocaine nor display any symptoms associated with cocaine during that time period.  Her supervisors stated that they had never seen any signs of drug use.  Belmaggio argues that her good military record and lack of other indications of drug use indicate that the test was somehow flawed.  The fact that Belmaggio presented such exculpatory evidence does not rule out the existence of substantial evidence to support the BCNR determination.

5.  *Constitutional claims*

As a threshold matter, the court must decide whether Belmaggio has a property or liberty interest in her employment with the United States Navy.  The court finds

---

[19]10 U.S.C. § 1552 (1997); 32 C.F.R. § 723 (1997).

11

that she has both.[20]  Once it is determined that plaintiff is entitled to constitutional due process protections, "the question remains what process is due."[21]  "The essential requirements of due process ... are notice and an opportunity to respond."[22]

Belmaggio argues that the district court erred by upholding the BCNR decision because the BCNR is not empowered to make constitutional decisions.  However, the district court did not simply defer to the BCNR's opinion of the constitutional requirements; the district court independently found that Belmaggio's claims of constitutional deficiencies in the BCNR process were without merit.

a.   *Right to confrontation*

Belmaggio argues that the district court erred in finding that the Sixth Amendment right to confrontation does not attach to hearings before the ADB.  The government introduced the urinalysis evidence through the signed statement, and then the telephonic testimony, of Lieutenant Kleete, the Assistant Technical Director for the Navy Drug Screening Laboratory that performed the test in this case.  Belmaggio was not allowed to confront or cross-examine Lieutenant Kleete.  The board stated that a second phone call would be made only if the board members had a question.  Belmaggio argues that she would have questioned

---

[20]*See Perez v. United States*, 850 F. Supp. 1354, 1361 (N.D. Ill. 1994).

[21]*Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

[22]*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

Kleete on his assertions about the color of the sample and the lack of any sign of tampering. However, despite her right to do so, she did not ask to independently call Kleete as a witness.

The Sixth Amendment requires that, "[i]n all *criminal prosecutions*, the accused shall enjoy the right ... to be confronted with the witnesses against him." (Emphasis added). The only two courts to address the issue of the applicability of the Sixth Amendment to military administrative discharge proceedings both held that it does not apply:

> As discussed below, these Sixth Amendment rights do not apply in the administrative discharge context. Procedural due process generally requires notice and some form of pre-deprivation hearing. *See Zinermon v. Burch,* 494 U.S. 113, 127, 110 S. Ct. 975, 984, 108 L.Ed.2d 100 (1990) (citing *Loudermill*, 470 U.S. at 542, 105 S. Ct. at 1493). While the hearing should normally be sufficiently structured to allow the plaintiff an opportunity to be heard and to respond to the charges against him, it need not provide him with the same protections afforded defendants in criminal trials.[23]

Belmaggio argues that the President or Congress must explicitly delegate authority to a governmental body to allow it to deprive an individual of their employment where it implicates constitutional concerns. However, the case she cites, *Green v. McElroy*,[24] simply rejected an implied delegation where the statute had not delegated any authority to even create the

---

[23]*Perez v. United States*, 850 F. Supp. 1354, 1364 (N.D. Ill. 1994) (citations omitted). *See also Unglesby v. Zimny*, 250 F. Supp. 714 (N.D. Cal. 1965).

[24]360 U.S. 474, 506-07 (1959).

13

security clearance program whose specific procedures were at issue.

Belmaggio argues that this case is similar to parole and probation hearings because both implicate a liberty interest and misconduct must be shown by a preponderance of the evidence. Based on that argument, she reviews the Fifth Circuit cases involving parole revocation in which the court has required the government to show good cause why urinalysis evidence should be allowed in through the testimony of a probation officer; the court employed a balancing test, weighing the defendant's interest in confronting a specific witness against the government's reasons for denying it.[25] Belmaggio argues that Kleete is analogous to a probation officer. However, unlike a probation officer who would simply receive reports from the lab, Kleete has a Ph.D in Pharmocology/Toxicology and certifies the lab results after assuring that proper procedures have been followed.

Belmaggio also compares this proceeding to an employment hearing. She argues that the Supreme Court has held that the confrontation clause applies in employment hearings.[26] However, the Court was addressing situations in which the employee was denied any kind of a hearing; in this case, Belmaggio had an

---

[25]*See, e.g.*, *United States v. McCormick*, 54 F.3d 214, 220-21 (5th Cir. 1995).

[26]*See, e.g.*, *Willner v. Committee on Character & Fitness*, 373 U.S. 96 (1963) (New York bar denied admission to a new lawyer).

14

opportunity to be heard and was even represented by counsel at the ADB hearing.

Belmaggio cites to *Bland v. Connally*,[27] in which the court held that the respondent has a constitutional right to confront witnesses against him in an administrative proceeding recommending a less than honorable discharge. In that case, the respondent was being discharged for association with the communist party, and the court stated that the military had "no express authority to premise a derogatory discharge upon association with suspect groups or individuals. Also, while [regulations] do provide that a derogatory discharge must be based solely upon the military record of the dischargee, they confer no express power to establish the necessary facts by secret evidence."[28] The military had not allowed the respondent even to know the identity of the witnesses against him, much less confront them.[29] Moreover, the grounds for the discharge, association with communists, was itself suspect under the First Amendment. The case before this court is quite different. Belmaggio had several due process protections: she knew who was presenting the evidence against her, what that evidence was, had the right to present her own evidence and call witnesses, and was represented by counsel.

---

[27] 293 F.2d 852 (D.C. Cir. 1961).

[28] *Id.* at 856.

[29] *Id.* at 858.

15

Belmaggio cites *Goldberg v. Kelly*,[30] to support her argument that a right to confront witnesses is essential.  The Court did state that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."[31]  However, in that case, "The constitutional issue to be decided ... [was] the narrow one whether the Due Process Clause requires that the recipient be afforded an evidentiary hearing *before* the termination of benefits."[32]  Moreover, while the Court found that a right to confront witnesses was a requirement, that decision was based on the context, the nature of the right at issue -- welfare benefits.  "Thus the crucial factor in this context--a factor not present in the case of the blacklisted government contractor, *the discharged government employee,* the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are ended--is that termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits."[33]

Belmaggio also cites to *Jenkins v. McKeithen*.[34]  In that case, the appellant challenged the constitutionality of a 1967

---

[30]397 U.S. 254 (1970).

[31]*Id.* at 269.

[32]*Id.* at 260 (emphasis in original).

[33]*Id.* at 264 (emphasis added).

[34]395 U.S. 411 (1969).

Louisiana statute which created a body called the Labor-Management Commission of Inquiry. The purpose of the Commission was to aid the law enforcement authorities of the state by investigating and making findings on possible violations of the labor laws. The Court found that "the Commission very clearly exercises an accusatory function; it is empowered to be used and allegedly is used to find named individuals guilty of violating the criminal laws of Louisiana and the United States and to brand them as criminals in public."[35] "In the present context, where the Commission allegedly makes an actual finding that a specific individual is guilty of a crime, we think that due process requires the Commission to afford a person being investigated the right to confront and cross-examine the witnesses against him, subject only to traditional limitations on those rights."[36] However, unlike the administrative board, the Commission limited the individual's right to present his or her own evidence.

b.   *Introduction of Urinalysis Evidence*

Belmaggio argues that the urinalysis evidence was improperly admitted because there was evidence of tampering and lapses in the chain of custody. The Navy Military Personnel Manual (MILPERSMAN) § 3640350 provides that all relevant evidence be admitted before an administrative board and that evidence that

---

[35]*Id.* at 427-28.

[36]*Id.* at 429.

17

would not be admissible at a court-martial can be used at an administrative proceeding.

To admit laboratory analysis of fungible material, such as urine, the government must demonstrate a continuous chain of custody.[37]  "The Government must show that there is a reasonable probability the sample which was tested was in fact from the purported source and that it was not altered."[38]  This means the "chain-of-custody evidence must be adequate--not infallible."[39]  "Factors to be considered in making this determination [of chain of custody] include the nature of the article, the circumstances surrounding the preservation and custody of it, and the likelihood of intermeddlers tampering with it."[40]  Belmaggio argues that the standard in this case should be higher because urine is a fungible substance.  However, the case she relied on involved drugs, also a fungible substance.  If anything, given that that case dealt with a court-martial, the standard for this case, for admission before an administrative board, is lower.

Belmaggio argues that the government tried to rely on a presumption that law enforcement personnel have properly maintained the evidence.  The government cannot rely solely on

---

[37]*United States v. Courts*, 9 M.J. 285, 290 (C.M.A. 1980).

[38]*United States v. Maxwell*, 38 M.J. 148, 150 (C.M.A. 1993).

[39]*United States v. Ladd*, 885 F.2d 954, 957 (1st Cir. 1989).

[40]*United States v. Longtin*, 7 M.J. 784, 789 (A.C.M.R. 1979) (citation omitted).

18

such a presumption.[41]  However, the government did not do so.  It introduced testimony from the personnel involved in the chain of custody.  The government does not dispute that there was improper documentation of a change of custody.  However, a combination of documentary evidence and testimony from the coordinators established an unbroken chain of custody.

Belmaggio argues that the  urinalysis coordinators' stories did not completely match.  Also, there were inconsistencies between the statement provided on August 20 and the testimony given on September 26, which Belmaggio argues gives rise to the possibility of collusion.

Belmaggio argues that the sample bottles were prepared incorrectly, making tampering easier.  The local coordinators adopted a slightly different procedure than that prescribed by regulation.  The label was placed on the bottle, covered with scotch tape, and then the tamper resistant tape was placed on top after the sample was collected.  The coordinators testified, upon examination by Belmaggio's lawyer, that the scotch tape made it easier to remove the tamper resistant tape and replace it without being detected.

Another urine sample taken the same day from Petty Officer Johnson was found to be contaminated with mouthwash.  Belmaggio argues that the evidence showed that the contamination had to have occurred subsequent to the Johnson's delivery of the sample to the urinalysis coordinators, indicating that there were

---

[41]*United States v. Gardi*, 6 M.J. 703, 704 (N-M.C.M.R. 1978).

19

problems with the custody of the bottles.  Johnson's observer

testified that he watched Johnson urinating into the bottle, and

that he saw nothing to indicate that Johnson contaminated the

sample.  Belmaggio argues that, because of the evidence that

Petty Officer Johnson's sample was tampered with, the government

has not met its burden to show that there was a reasonable

probability that her sample had not been tampered with also.

Gross deviations in proper procedure is sufficient to

exclude results.  However, the case Belmaggio cites for support

is an example of truly gross deviations:

> [The urinalysis coordinator] had appellant
> deposit the sample in a cup with a plastic
> lid, rather than in a urine-specimen bottle,
> as required by AFR 160-23.  Additionally, the
> sergeant failed:  to seal the container with
> tamper-resistant tape;  to have appellant
> observe him seal the container;  to have
> appellant initial the container;  and to
> initial the container himself. ...
>     Other discrepancies in the chain of
> custody included the fact that the sample was
> not correctly labeled with the collection
> date, the base accession number, the member's
> social security number, the member's
> initials, and the observer's initials.  Para.
> 7(d)(3), AFR 160-23. ... At trial, he could
> not recall whether he or a nurse sealed the
> cup with a piece of tape.[42]

This case presents much more minor deviations from normal

procedure.

"[D]eviating from a regulation or instruction which sets out

procedures for collecting, transmitting, or testing urine samples

does not render a sample inadmissible as a matter of law;

---

[42]*United States v. Strozier*, 31 M.J. 283, 285 (C.M.A. 1990).

however, such deviation may be considered along with all other factors in determining if the evidence lacks sufficient reliability to be considered by the finders of fact."[43]

The BCNR, in approving the ADB's admission of the urinalysis evidence, noted that the results were relevant and not so tainted by errors as to be unreliable. As the district court stated, Belmaggio's arguments go to the *weight* of the evidence against her and do not show that the ADB clearly erred in admitting the urinalysis results.

For the foregoing reasons, the judgment of the trial court is AFFIRMED.

---

[43]*United States v. Pollard*, 27 M.J. 376, 377 (C.M.A. 1989) (citing *United States v. Caceres*, 440 U.S. 741 (1979)).